On Application for Rehearing
The opinion of June 28, 1996, is withdrawn, and the following opinion is substituted therefor.
Carter S. Kennedy, a licensed real estate broker, sued Polar-BEK Baker Wildwood Partnership ("Polar-BEK"), seeking damages for the breach of an express contract to pay a 5% real estate sales commission. In the alternative, Kennedy claimed the breach of an implied-in-fact contract to pay the 5% commission. The jury returned a general verdict in favor of Kennedy in the amount of $455,000, the amount of the 5% commission claimed by Kennedy. However, the trial court granted Polar-BEK's motion for a judgment notwithstanding the verdict (J.N.O.V.) on the express contract claim and granted it a new trial on the implied contract claim. The trial court also indicated in its judgment that if this Court reversed the J.N.O.V. on the express contract claim, then a new trial was also in order on that claim. Both Kennedy and Polar-BEK appeal.
The basic dispute in this case concerns a parcel of land that Polar-BEK conveyed to State Farm Mutual of Mobile Insurance Company for $9,100,000. Viewed in a light most favorable to Kennedy, the record suggests the following: Kennedy was one of several partners in a business partnership known as Wildwood Associates Unlimited ("Wildwood Associates"). Wildwood Associates purchased the property that is the basis of this dispute ("the Wildwood property") in October 1984 and owned it until March 1988, when it entered into a contract to sell it to the Aronov Group. In addition to Kennedy, Ron Carlson, who is now an employee of Polar-BEK, was a partner in Wildwood Associates. Carlson received a commission from Wildwood Associates in the approximate amount of $310,000 for the sale of the property to the Aronov Group. The contract to sell the property to the Aronov Group was executed in March 1988, but the sale did not close until 1989. After the conveyance to the Aronov Group, Polar-BEK purchased the Wildwood property. Polar-BEK was interested in selling portions of the property for commercial development.
Kennedy testified at trial that on various occasions after Polar-BEK purchased the Wildwood property Carlson had made various statements respecting the manner in which a person could earn a commission for the sale of a Wildwood property parcel. Carlson admitted at trial that he had announced a commission policy at the Birmingham Sales Club. Kennedy testified, regarding Carlson's announcement, that Carlson said that if a broker or agent physically "put a sales prospect on the property" and then "turned that person over to Polar-BEK," the broker or agent would earn a 5% commission if the property was sold to that prospect. The evidence at trial indicated that several other similar sales commissions had been paid by Polar-BEK.
In April 1989, Rome DeBlas came to Birmingham to investigate site possibilities for the location of a new State Farm office. DeBlas did not meet with Kennedy at that time, but he did identify the Wildwood property as a potential site during that visit. In August 1989, DeBlas returned to Birmingham, and Gene Crocker, an employee of Alabama Power Company, arranged several meetings for him. It is undisputed that one of the people DeBlas met with was Kennedy.
The record further indicates that, shortly before DeBlas's August visit to Birmingham, Crocker telephoned Pat O'Sullivan, another partner in Wildwood Associates, about a possible prospect for the Wildwood property. Crocker did not tell O'Sullivan that he was looking for the owner of the Wildwood property. O'Sullivan then telephoned Ron Carlson (then Polar-BEK's employee) and inquired about the terms of a real estate commission. Carlson told O'Sullivan three ways a commission could be earned from Polar-BEK for the sale of the Wildwood property. O'Sullivan made notes of these conversations, as follows:
"Letter from Buyer
"Bring man in to see Ron *Page 446 
"Sales contract"
O'Sullivan was not a broker or agent and, therefore, could not act in connection with any proposed sale. He did, however, at the request of Crocker, set up a meeting for DeBlas with Kennedy for August 9.
On August 9, Kennedy telephoned Crocker at Alabama Power Company and met with Crocker and the "prospect," DeBlas. Kennedy went to the Alabama Power Company offices, where he and DeBlas discussed site requirements. After the meeting, they visited the Wildwood property. While there, Kennedy and DeBlas discussed site characteristics and demographics. Kennedy testified at trial that he arranged an appointment for DeBlas to meet Carlson of Polar-BEK. Kennedy testified that he offered to go with DeBlas to Carlson's office for the meeting later that day. Kennedy also testified that Carlson knew Kennedy was a broker when Kennedy set up the meeting for DeBlas and Carlson. Kennedy stated that Carlson never mentioned to him that he had a previously arranged meeting with DeBlas.
DeBlas met with Carlson on August 9 and told him that he had met with Kennedy on the Wildwood property. That same day, Kennedy prepared and forwarded a letter to Carlson, notifying Carlson that he had met with DeBlas at the Wildwood property. Carlson responded, acknowledging receipt of the letter.
Thereafter, Kennedy made several attempts to further communicate with Carlson and Polar-BEK regarding the proposed sale of the Wildwood property. Between the first of August 1989 and the end of the year, Kennedy sent numerous letters to DeBlas requesting information about the sale of the Wildwood property. In fact, on December 5, 1989, Kennedy wrote Carlson, indicating that he had heard rumors that Polar-BEK questioned Kennedy's right to a commission if State Farm acquired a portion of the Wildwood property. On that same day, Carlson transmitted to Polar-BEK's "management committee" all of the correspondence from Kennedy, and Carlson notified Kennedy by letter that there had been no decision made respecting Kennedy's claim to the commission.
In January 1990, Kennedy wrote Alex Baker of Polar-BEK. In his letter, Kennedy mentioned that he had spoken with Carlson about his claim for a sales commission and that he would like to meet in an attempt to resolve any dispute or questions that had arisen regarding his claim. Thereafter, Kennedy met with Baker and others, but the matter was not resolved. Polar-BEK took the position that Kennedy was not due any compensation.
In May 1990, Polar-BEK entered into a contract for the sale of a portion of the Wildwood property, agreeing to convey that portion to State Farm for $9,100,000. The contract included a provision stating that no real estate broker would be entitled to a commission on the sale. Polar-BEK refused to pay Kennedy a 5% commission, and Kennedy sued.
As noted previously, Kennedy appeals the trial court's grant of a J.N.O.V. in favor of Polar-BEK on his express contract claim, while Polar-BEK appeals the denial of its J.N.O.V. motion on his implied contract claim. A motion for a J.N.O.V. tests the sufficiency of the evidence on the same basis as a motion for a directed verdict. Morgan v. South Central BellTelephone Co., 466 So.2d 107 (Ala. 1985). On review of a J.N.O.V., this Court must consider the evidence in a light most favorable to the nonmoving party and if from the evidence reasonable inferences can be drawn in favor of that party's position then the J.N.O.V. must be reversed. Terrell v. JohnDeere Co., 491 So.2d 918 (Ala. 1986).
The dispositive issue is whether the record contains substantial evidence to support the jury's finding that a contract existed between Kennedy and Polar-BEK. The essential elements for a contract in Alabama are an agreement, consideration, two or more contracting parties, a legal object, and capacity. Shirley v. Lin, 548 So.2d 1329 (Ala. 1989). Because the case was submitted to the jury on the alternative theories of an express contract and an implied-in fact contract, over directed verdict motions by the defendants, and the jury rendered a general verdict, we must determine whether Kennedy *Page 447 
offered substantial evidence in support of both theories.Green Tree Acceptance, Inc. v. Tunstall, 645 So.2d 1384
(Ala. 1994); Aspinwall v. Gowens, 405 So.2d 184 (Ala. 1981).
We first note that under Alabama law, claims of both an express and an implied contract on the same subject matter are generally incompatible. This Court has recognized that where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter. Vardaman v. Florence City Bd. of Educ.,544 So.2d 962 (Ala. 1989); Hendrix, Mohr Yardley, Inc. v. City ofDaphne, 359 So.2d 792 (Ala. 1978); Robinson Lumber Co. v. Sager,199 Ala. 675, 75 So. 309 (1917). However, the existence of an express contract in the above-noted cases was not in dispute; only its terms were disputed. In this case, the existence of an express contract (allegedly formed by Kennedy's acceptance by performance of Polar-BEK's unilateral offer) was highly disputed and remained a question of fact, as did the alternative existence of an implied contract. Thus, the law may recognize an implied contract where the existence of an express contract on the same subject matter is not proven. Thus, it was for the jury to decide whether an express contract existed, or an implied contract, and we conclude that the trial court properly submitted both alternative contract theories to the jury.
Viewing the evidence in a light most favorable to Kennedy, as the nonmovant on the motion for J.N.O.V., we conclude that the jury could have found that the statements made by Carlson as a representative of Polar-BEK constituted an express offer for a unilateral contract, and we conclude that Kennedy presented substantial evidence that he performed the terms of that offer. Evidence was presented that, through its duly authorized agent, Polar-BEK promised to pay a 5% sales commission to anyone performing two specific acts: first, put a prospective purchaser on the property and, second, turn the prospective purchaser over to Polar-BEK. Although the testimony as to these events was disputed, the jury could have believed Kennedy's testimony as to the terms of the Polar-BEK offer. The jury also reasonably could have believed that Kennedy performed the acts requested by Polar-BEK and performed them in such a manner that his performance constituted an acceptance of the proposal. The jury could have found that he arranged an appointment with DeBlas, the prospective purchaser's representative, and took him to the site. It also could have found that he "turned over" DeBlas to Carlson, who was an employee of Polar-BEK. Thus, the trial court erred in granting Polar-BEK's motion for a J.N.O.V. on the express contract claim.
Alternatively, viewing the evidence in a light most favorable to Kennedy, we conclude that he also presented substantial evidence of an implied contract. The jury reasonably could have found that while Kennedy did not perform whatever actions were necessary to accept Polar-BEK's unilateral offer and create an express contract, the parties did form an implied contract.
Kennedy alleged that he was the "procuring cause" of the sale of the Wildwood property and that he was due a commission for the sale. This Court has stated:
 "It is the settled law of this State that where one knowingly accepts services rendered by another, and the benefit and result thereof, the law implies a promise on the part of the one accepting with knowledge the services rendered by another to pay the reasonable value of such services rendered."
Hendrix, Mohr Yardley, supra, 359 So.2d at 795. Similarly, one noted legal commentator has explained:
 "Sometimes a contract that results from words is described as 'express,' while one that results from conduct is described as 'implied in fact,' but the distinction as such has no legal consequences. Conduct that would lead a reasonable person in the other party's position to infer a promise in return for performance . . . may amount to an offer. . . . One who begins to perform services for another in apparent expectation of payment may be taken to be offering to furnish them for reasonable compensation. The question of fact in each case is whether a reasonable person in the position *Page 448 
of the other party would understand that payment was expected for the services and that they were not gratuitous."
E. Allan Farnsworth, Contracts § 3.10 (2d ed. 1990) (footnotes omitted). Thus, the jury reasorably could have found that Kennedy's actions in relation to DeBlas and Carlson amounted to an offer to furnish his assistance to Polar-BEK in return for reasonable compensation, which Polar-BEK was due to pay. The trial court correctly denied Polar-BEK's motion for a J.N.O.V. on the implied contract claim.
The trial court also ruled that if this Court were to reverse its grant of a J.N.O.V. to Polar-BEK on Kennedy's express contract claim, then it would grant a new trial on that claim. However, we have concluded that both of Kennedy's alternative contract claims were supported by substantial evidence and were properly submitted to the jury, which rendered a verdict in favor of Kennedy. The general rule is that a jury verdict is entitled to a strong presumption of correctness. NortheastAlabama Regional Medical Center v. Owens, 584 So.2d 1360
(Ala. 1991). While we acknowledge the power of a trial court to set aside verdicts, that power, " 'while inherent in order to prevent irreparable injustice, is a power hesitantly exercised because of the solemnity of a jury verdict regarded in the background of that most precious of rights, the right of a trial by jury.' Walker v. Henderson, 275 Ala. 541, 544,156 So.2d 633, 636 (1963)." White v. Fridge, 461 So.2d 793, 794
(Ala. 1984).
In sum, we conclude that the trial court correctly denied Polar-BEK's motion for a J.N.O.V. on the implied contract claim, but erred in entering the J.N.O.V. on the express contract claim and in ordering a new trial in the event this Court reversed the J.N.O.V. The J.N.O.V. and the new trial order are reversed, and the cause is remanded for the entry of a judgment in favor of Kennedy.
We also note that because we are reversing the trial court's judgment and holding in favor of Kennedy, interest should be added to the amount of the jury's verdict according to Ala. Code 1975, § 8-8-10. However, because the jury's general verdict may have been rendered on the implied contract claim, on which the amount of Kennedy's damages would not have been a sum certain until determined by the jury, prejudgment interest may not be awarded. Ala. Code 1975, § 8-8-8; Health Care Authority of theCity of Huntsville v. Madison County, 601 So.2d 459 (Ala. 1992).
OPINION OF JUNE 28, 1996, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED; APPLICATION OVERRULED.
ALMON, SHORES, HOUSTON, KENNEDY, INGRAM, COOK, and BUTTS, JJ., concur.
HOOPER, C.J., dissents.