812 So.2d 1165 (2001)
K.B. WEYGAND & ASSOCIATES, P.C.
v.
DEERWOOD LAKE LAND COMPANY.
Deerwood Lake Land Company
v.
K.B. Weygand & Associates, P.C.
1991216 and 1991344.
Supreme Court of Alabama.
April 20, 2001.
Rehearing Denied July 6, 2001.
*1166 Jesse P. Evans III and Michael B. Odom of Najjar Denaburg, P.C., Birmingham, for appellant/cross appellee K.B. Weygand & Associates, P.C.
Scott A. Powell, Bruce J. McKee, and Nolan E. Awbrey of Hare, Wynn, Newell & Newton, Birmingham, for appellee/cross appellant Deerwood Land Company.
WOODALL, Justice.
The trial court entered judgment in favor of the plaintiff, Deerwood Lake Land Company ("Deerwood"), and against the defendant, K.B. Weygand & Associates, P.C. ("Weygand"). Weygand appeals from that judgment. (Case No. 1991216.) Deerwood cross-appeals from the trial court's refusal to include pre-judgment interest in its award. (Case No. 1991344.)
Deerwood is a private subdivision in Shelby County. Weygand is a civil engineering firm. In 1995, Deerwood hired Weygand to plan and execute the expansion of its lake and subdivision, including a necessary road. The road was designed and built in accordance with Shelby County's requirements for what is commonly referred to as a "6-2-1" road. The subdivision road contained a six-inch base, consisting of crushed rock, stone particles, or slag, placed on top of the subgrade. Two inches of plant-mix asphalt, or binder, was placed on top of the six-inch base. A one-inch seal coat of asphalt was required to be placed on top of the binder, but Shelby County will not allow the seal coat to be applied for one year or until ninety percent of the houses in the subdivision are constructed. The binder allows water to pass *1167 into the base, but the seal coat helps keep the water from passing through the binder into the base.
Shortly after the binder was applied, and long before the seal coat could have been applied, the road failed. Weygand hired Alain Gallet, a geotechnical engineer, to assess the failure. Gallet found that excessive water trapped below the base stone had caused the pavement to "float" and the asphalt to crack. It was Gallet's opinion that the water had infiltrated the binder layer and had become trapped below the base stone because the roadbed, also referred to as the subgrade, was impervious and, therefore, the water did not pass through it. Gallet recommended the installation of lateral drains to expedite the flow of water from beneath the base stone into existing ditches. Deerwood followed Gallet's recommendation and incurred expenses totalling $58,187.84 in repairing and repaving the road.
On April 23, 1998, Deerwood sued Weygand in the Shelby Circuit Court, seeking damages allegedly caused by the failure of the road. The complaint stated claims for negligence, breach of warranty and breach of contract. Weygand answered, denying any negligence, denying any breach of contract, and denying the existence of any warranty, express or implied.
The case was tried by the trial court without a jury. On November 2, 1999, the trial court found in favor of Deerwood and against Weygand and entered a judgment in the amount of $72,146.27 which included an award of pre-judgment interest. In basing the judgment upon a finding that Weygand had breached an implied warranty, the trial court stated as follows:
"1. The contract between the parties included an implied warranty whereby defendants `impliedly warranted the sufficiency and adequacy of the plans and specifications to reasonably accomplish the purpose for which they were intended.' Broyles v. Brown Engineering Co., 275 Ala. 35, 38, 151 So.2d 767 (1963). `[W]here one party furnishes plans and specifications for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purpose in view.' Id. at 39 [, 151 So.2d 767].
"2. Because defendants' plans were inadequate, defendants are liable for breach of warranty.
"3. Because plaintiff will be compensated under the breach of warranty count, it is unnecessary to consider the breach of contract and negligence counts, and those two counts are dismissed."
(Clerk's Record at 32, 33.)
Weygand filed a post-trial motion on December 2, 1999. On February 17, 2000, the trial court amended the November 2, 1999 order, entering judgment in favor of Weygand on both the breach of contract and negligence claims. The judgment against Weygand continued to be based only on the trial court's finding that Weygand's "plans did not sufficiently provide for water drainage from the roadbed." (Clerk's Record at 50.) In its amended order, the trial court reduced the damages to $58,187.84 and found that Deerwood was not entitled to pre-judgment interest. Weygand filed a timely notice of appeal from the judgment against it. Deerwood cross-appealed only from the trial court's failure to include pre-judgment interest in its final judgment.
The following issue is dispositive: Did the trial court err in concluding that the agreement between Deerwood and Weygand included an implied warranty whereby Weygand guaranteed the sufficiency and adequacy of the plans and specifications for the road to reasonably accomplish the purpose for which they were intended? *1168 In reaching that conclusion, the trial court was required to apply the law to undisputed facts and, therefore, the ore tenus presumption of correctness does not apply. DeWitt v. Stevens, 598 So.2d 849, 850 (Ala. 1992). We conclude that the trial court incorrectly applied the law to the facts and, therefore, erred to reversal.
Deerwood and Weygand agree that the resolution of the dispositive issue must begin with an analysis of Broyles v. Brown Engineering Co., 275 Ala. 35, 151 So.2d 767 (1963). In Broyles, civil engineers agreed to submit plans and specifications to the plaintiffs for drainage of a proposed subdivision. The complaint was summarized:
"The complaint further charges that the drainage areas depicted on the plans submitted by the defendant were incorrect and did not show adequate storm drainage easements where necessary; that the drainage plans were inadequate for the purpose for which they were to be used; and that the drainage of the subdivision, due to the incorrectness of the plans and specifications submitted by defendant pursuant to its employment by plaintiffs, was (and is) subject to periodic floodings."
Id. at 37, 151 So.2d at 769. The parties' positions were stated:
"The defendant contends that in the absence of an express contract, there is no liability for the alleged insufficiency or inadequacy of the plans except as may be attributable to its negligence or its failure to use reasonable skill and diligence in their preparation. Neither negligence nor the want of reasonable skill and diligence in the preparation of the plans was charged in the complaint. A breach of implied warranty of adequate results is the gravamen of each count. Plaintiffs take the position that an implied warranty exists and it casts upon the defendant the obligation of a guarantor or insurer of the plans for the purpose in view and of which defendant had knowledge when it accepted employment."
Id. at 37, 151 So.2d at 769-770.
This Court stated in Broyles that the civil engineer "impliedly warranted the sufficiency and adequacy of the plans and specifications to reasonably accomplish the purpose for which they were intended as alleged in the several counts of the complaint." Id. at 38, 151 So.2d at 770.
The Court explained the basis for its opinion:
"It is our opinion that an engineering survey of drainage requirements of a tract of land to be developed as a subdivision on which dwellings are to be erected, as here presented, is not entailed with unknown or uncontrollable topographical or landscape conditions as would prevent a drainage survey, if properly made with reasonable skill and diligence by a qualified civil engineer, from being reasonably accurate by the proper use of instruments and known formulas accepted and used by the civil engineering profession.... A contracting civil engineer employed to survey and submit plans and specifications for drainage of an area of land as here involved, when he accepts employment, being competent and qualified as he holds himself out to be, should expect to be charged with a guaranty of reasonable results, and we think that in his dealings and in common fairness he does so expect."
Id. at 40, 151 So.2d at 772. (Emphasis added.)
The language in Broyles was limited to the facts of that case and did not state any broad general rule. In fact, this Court *1169 stated that a case-by-case analysis would be required:
"We recognize that in the absence of an express contract, the courts are reluctant to construe contractual dealings and services of lawyers, physicians and architects, and probably some other professions, as implying a contract of guaranty or insurance of favorable results. And under some circumstances civil engineers will not be held to have impliedly warranted or insured favorable or certain results. It all depends on the nature of the employment and the particular services to be rendered."

Id. at 38, 151 So.2d at 771. (Emphasis added.) We conclude that this case presents circumstances where "civil engineers will not be held to have impliedly warranted or insured favorable or certain results."
Weygand provided plans and specifications for a "6-2-1" road which met Shelby County's subdivision requirements. The road was built on the subgrade (soil) by other companies with materials which Weygand did not supply or produce. The nature of such employment and services is more similar to the employment and services of an architect than to a civil engineering firm which merely surveys and submits plans and specifications for the drainage of an area of land. As discussed in Broyles, architects are not held to a strict accountability of guaranty:
"Architects must have as a part of their competency a keen aesthetic sense to enable them to design structures of beauty and dignity; they must have a technical knowledge of many structural factors which lend strength and stability to their designs. The materials they recommend for use are produced by agencies beyond the control and influence of the architect. His work ... depends ... on production of materials by others.... The texture of the soil for a foundation, a factor beyond his control, must be considered. For these reasons and others which we will not undertake to enumerate, our courts have not held architects to a strict accountability of guaranty."
Id. at 39, 151 So.2d at 771-72. (Emphasis added.)
It would be contrary to justice and fair dealing between the parties to hold a civil engineer strictly liable for a road failure where an unknown soil condition can cause the failure despite the exercise of reasonable skill and diligence in the preparation of the plans and specifications. The Deerwood road was built on Townley soil which is commonly found in Shelby County. A known characteristic of the soil is that it has a slow percolation rate, that is, water passes through it slowly. However, the failure of the road did not result from that characteristic. Instead, the road failed because the soil beneath it was wholly impervious and, therefore, would not drain at all. None of the engineers who testified had seen or heard of another similar situation. As the trial court found, Weygand "and other similarly situated engineers did not appreciate the effect of the particular Townley soil in the location of Deerwood Lake and its effect on subgrade drainage." (Clerk's Record at 50, 51.)
Deerwood argues that the soil condition which caused the failure of the road was "knowable." However, while it is generally known that water passes through Townley soil slowly, there was no evidence that any engineer knew or should have known that the soil beneath the road would not drain at all. A visual inspection of the soil would not indicate that it was wholly impervious. Also, in road design and construction, there is no standard test used to measure the permeability of soil.
Deerwood argues that the water that was trapped beneath the base by the *1170 Townley soil was a "controllable" condition. It is true that Gallet's post-failure design controlled the problem and resulted in a stable road. However, the evidence was undisputed that drains are not within the typical scope of an engineer's work in designing a road.
For the foregoing reasons, the judgment in favor of Deerwood and against Weygand is reversed and judgment is rendered in favor of Weygand. The pre-judgment interest issue raised in the cross-appeal is moot.
1991216REVERSED AND JUDGMENT RENDERED.
STUART, J., concurs.
MOORE, C.J., and BROWN and HARWOOD, JJ., concur in the result.
HOUSTON, SEE, LYONS, and JOHNSTONE, JJ., dissent.
1991344APPEAL DISMISSED AS MOOT.
MOORE, C.J., and STUART, J., concur.
HOUSTON, SEE, LYONS, BROWN, and HARWOOD, JJ., concur in the result.
JOHNSTONE, J., dissents.
MOORE, Chief Justice (concurring in the result in case no. 1991216 and concurring in case no. 1991344).
I concur in the result in case no. 1991216, but write to explain my disagreement with Broyles v. Brown Engineering Co., 275 Ala. 35, 151 So.2d 767 (1963). Broyles, a case involving civil-engineering plans for drainage of a proposed housing-project subdivision, made two significant and novel distinctions in warranty law. I think the Broyles opinion went too far and attempted to make decisions inappropriate for a judicial body.[1]
First, Broyles, in attempting to impose a guarantee of favorable results upon civil engineers in the absence of an express contract, distinguished between civil engineering and other professions such as those of the attorney, the physician, and the architect. Traditionally, personal services, unlike products, have not been subject to implied warranties. A person providing personal services is liable to another when the provider does not use reasonable care and skill in performing the work. Shine v. Nash Abstract & Inv. Co., 217 Ala. 498, 117 So. 47 (1928). The Broyles opinion deviated from this prior principle, by stating:
"A warranty of work may exist, however, if the parties so intended, without the use of any particular words in the contract.
". . . .
"We are of the opinion that, according to the allegations of the complaint, which on demurrer are admitted as true for the purpose of pleading, the defendant impliedly warranted the sufficiency and adequacy of the plans and specifications to reasonably accomplish the purpose for which they were intended as alleged in the several counts of the complaint. We are further of the opinion that an express warranty was not necessary to charge the defendant with becoming an insurer or guarantor that such plans and specifications would reasonably accomplish the purposes in view." (Citations omitted.)
275 Ala. at 38, 151 So.2d at 770. (Citations omitted.) Where did the two Justices joining the Broyles opinion obtain that view? *1171 They cited cases from other jurisdictions in support of these propositions dealing with a warranty of work as opposed to a warranty of a product. The Broyles opinion also contains a discussion of the allegations and the facts dealing with the civil engineer's holding himself out as an expert and his stating that his work would adequately deal with the problems of drainage at the proposed development. The argument makes sense; however, the argument would apply to every kind of contract of employment. Based on the logic of the Broyles opinion, a person, no matter what the line of work, should guarantee that work to the satisfaction of the purchaser of that work. It would apply to the plumber, the baker, the carpenter, the lawyer, everyone. But the Broyles opinion did not result in that conclusion in that case.
The Broyles opinion made an exception to the rule that it had just made, by exempting from liability under warranty attorneys, physicians, architects, "and probably some other professions." 275 Ala. at 38, 151 So.2d at 771. The opinion did not explain what other professions might be exempt; we simply know that there probably exist some somewhere. But the Justices joining the opinion were quite sure that three professions should be exempt. Why? Because the practice of those professions involves circumstances and actions that are not within the individual human worker's control. The practice of medicine is not to the point of development as a science that it can guarantee favorable results.[2] "Lawyers, in the practice of their profession, are dependent on the legal pronouncements of judicial agencies of government. Interpretation of law is [not] and cannot be an exact and accurate science." 275 Ala. at 39, 151 So.2d at 771. As for the architect, "[h]is work is to a certain degree experimental or depends on the experiments and on production of materials by others." 275 Ala. at 39, 151 So.2d at 771.
These statements indicate either an ignorance of science or an arrogance that would be intolerable in one of the professions mentioned.[3] How did the Justices joining the Broyles opinion determine that civil engineering in the area of land and water drainage was more precise and capable of guaranteeing results than were the fields of medicine, law, and architecture? Contemplating the measure of knowledge necessary to make such a determination is breathtaking. A judge or set of judges would have to be expert in all four areas. I have no doubt that each Justice who joined in the Broyles opinion was an expert in the area of law, but I doubt whether either of them had any expertise in any of the other areas. At least the opinion makes no mention of any such expertise. It does not even refer to expert testimony in the record of trial to *1172 support its conclusion. But the opinion did not stop there.
Second, the Broyles opinion made the following distinction:
"And under some circumstances civil engineers will not be held to have impliedly warranted or insured favorable or certain results. It all depends on the nature of the employment and the particular services to be rendered."
275 Ala. at 38, 151 So.2d at 771.
Who would make such a determination as to whether a civil engineer was guaranteeing the work or not? Judges. This kind of decision is fertile ground for judges to make difficult, even impossible, judgments as to what work is warranted by a person of a completely different profession, a profession that did not even have a voice in creating the new standard imposing liability on its members. Yet the Broyles Justices, not being expert in civil engineering, as far as we know, created the distinction between exempt professions (we do not know which ones they are or how many there are, but we know lawyers are exempt) and liable professions (again we do not know how many or which ones are subject to liability, but we do know civil engineers are).[4] In addition, civil engineers are not always liable for guaranteeing their work.[5]
The opinion in Broyles is an open invitation to abuse of the judicial system. Why? Because lawyers and judges want to abuse the system? No, because the creation of vague and indeterminate areas of law, created by the courts themselves, is the means by which abuse can occur. Without a predictable standard, law loses its power to guide conduct and becomes a means of "catching" an innocent party off-guard and unprepared for the legal attack. One never knows which way the court may rule when the judgment is subject to many potential vagaries and unknowns and when those who are not competent to make judgments as to certain sciences are empowered to make such judgments. The civil engineer in this case should be held *1173 liable, as with any other profession, if he had acted negligently. Because I disagree with the Broyles opinion, but I agree with the result of today's main opinion as to case no. 1991216, I concur in the result only in that case.
In case no. 1991344, I concur.
HOUSTON, Justice (dissenting in case no. 1991216 and concurring in the result in case no. 1991344).
I would affirm the judgment in case no. 1991216; therefore, I dissent in that case. I believe it was a question for the trier of fact as to whether the drainage problem that caused the destruction of the road within two weeks was a condition controllable by Weygand; therefore, I would affirm the judgment of the trial court in case no. 1991216. I concur in the result as to case no. 1991344. I would affirm the trial court's order denying prejudgment interest. Kennedy v. Polar-BEK & Baker Wildwood P'ship, 682 So.2d 443, 448 (Ala. 1996).
SEE, Justice (dissenting in case no. 1991216 and concurring in the result in case no. 1991344).
In case no. 1991216, I respectfully dissent from the main opinion's conclusion that the trial court erred when it found an implied warranty in the agreement between Deerwood and Weygand. I would affirm the trial court's judgment, based on Broyles v. Brown Engineering Co., 275 Ala. 35, 151 So.2d 767 (1963).
In case no. 1991344, I concur in the result of dismissing the appeal as moot, although I would affirm the trial court's finding that Deerwood was not entitled to prejudgment interest. Kennedy v. Polar-BEK & Baker Wildwood P'ship, 682 So.2d 443, 448 (Ala.1996).
LYONS, Justice (dissenting in case no. 1991216 and concurring in the result in case no. 1991344).
I respectfully dissent from the reversal of the judgment in case no. 1991216. I would affirm that judgment.
The trial court, after a bench trial, concluded that Weygand was not guilty of negligence in its failure to know about the Townley soil problems and to design "control" drains in the original plans. Deerwood has not cross-appealed from the trial court's finding for Weygand on the negligence claim. What then is the relevance of that portion of the main opinion concluding (a) that there was no evidence that any engineer knew or should have known that the soil beneath the road would not drain at all and (b) that there is no standard test used to measure the permeability of soil?
The liability of a civil engineer on an implied warranty of the adequacy of his design derives from Broyles v. Brown Engineering Co., 275 Ala. 35, 151 So.2d 767 (1963). The opinion in Broyles, joined by two justices, stated that under certain circumstances such an implied warranty would exist. The opinion stated:
"[A]n engineering survey of drainage requirements [for a proposed subdivision] is not entailed with unknown or uncontrollable topographical or landscape conditions as would prevent a drainage survey, if properly made with reasonable skill and diligence by a qualified civil engineer, from being reasonably accurate by the proper use of instruments and known formulas accepted and used by the civil engineering profession."
275 Ala. at 40, 151 So.2d at 772.
Weygand contends that the undisputed testimony established that the uniqueness of the soil constituted "unknown or uncontrollable topographical or landscape conditions." Deerwood challenges this conclusion *1174 by pointing out that even though Weygand employees did not subjectively know or appreciate the degree of Townley soil problems, the fact that that kind of soil retained water was "knowable and controllable." Deerwood then points to the evidence indicating that Gallet, who was brought in after problems were encountered, designed drains that did control the problem and that gave a satisfactory road.
The difficulty in deciding this case results from the numerous dicta in the Broyles opinion, dicta dealing largely with other professions, in which the two justices attempted to limit the scope of their opinion. They stated that no implied warranty attached to services that were largely experimental and subject to conditions beyond the control and influence of the actor. In illustrating this point, they discussed several professions. Dealing specifically with architects, the two justices stated that they generally are not subject to liability for breach of an implied warranty and noted several circumstances related to architects, including the proposition that "[t]he texture of the soil for a foundation, a factor beyond [the architect's] control, must be considered." 275 Ala. at 39, 151 So.2d at 771-72.
This broad-brush statement is accurate in a context where the circumstances surrounding an architect's rendition of services do not imply either an awareness or a responsibility on the part of the architect as to potential site problems that might exist. Where a wholly unpredictable circumstance is encountered, or where an architect's responsibility is only to generate plans for construction of a building and he has no responsibility for site conditions, as is the case where a civil engineer is separately engaged for the rendition of such services, the dicta in Broyles could have a proper field of operation.
Today's main opinion extends to Weygand the exonerating circumstance applicable to architects encountering soil conditions beyond their control. However, in doing so, it overlooks Gallet's testimony that K.B. Weygand, a principal in K.B. Weygand & Associates, P.C., knew he was designing a road in impervious Townley clay and that he should have known that the Townley clay would trap water at least to some degree. Moreover, Mr. Weygand testified: "We generally tried to avoid Townley soil because it doesn't perk." Gallet also testified that if Mr. Weygand had contacted him while designing the original road and told him that the soil was a clay soil that holds water more than normal soil does, he would have told Weygand to "make sure you have got some ditches" and to "make sure you have got some drains." While it is reasonable to conclude that Weygand was not negligent in failing to foresee the impervious soil actually encountered, the encounter with this soil was by no means wholly unpredictable and, therefore, was not beyond Weygand's control.
The Broyles opinion took into account the engineer's awareness of the site where his subdivision drainage system failed. In describing the evidence, the opinion stated:
"The complaint alleges knowledge on the part of the defendant that plaintiffs intended to subdivide the tract of land and convert the same to the erection of dwellings thereon, entailing an expensive outlay of money. The defendant professed to be expert or held itself out to be, and certainly was charged with notice that correct and adequate plans and specifications were essential for adequate drainage of rain water from the area of land to be converted. Common understanding and the ordinary course of dealing would speak up and justify a reasonable conclusion, as we view all the circumstances and the nature of the contract, *1175 that the parties mutually intended an agreement of guaranty as to the sufficiency and adequacy of the plans and specifications to accomplish proper and adequate drainage. To hold otherwise would be to ignore practical and common sense implications that arise from contractual dealings and negotiations as here presented in the complaint."
275 Ala. at 38, 151 So.2d at 770-71 (emphasis added). The evidence before the trial court indicated Weygand had the same general familiarity with the site as the engineer in Broyles had regarding the site involved in that case.
The absence of evidence indicating that any engineer knew or should have known that the soil beneath the road would not drain at all and the absence of a standard test used to measure the permeability of soil, upon which the main opinion relies, are simply not relevant at this stage of the proceedings. The trial court properly relied upon this state of the record when it denied recovery on a theory of negligence. However, the only issue on appeal is whether the trial court erred in finding Weygand liable for breach of an implied warranty. Here, as was the case in Broyles, the evidence was sufficient to charge Weygand with such knowledge of, and responsibility for, site conditions as to preclude him from claiming excuse by reason of "unknown or uncontrollable topographical or landscape conditions." Weygand's relationship to this site is fundamentally different from the relationship that would be created by the circumstances described in Broyles whereby an architect is not held to an implied warranty by reason of the texture of the soil used for a foundation.
I join Justice Houston's special writing both as to case no. 1991216 and as to case no. 1991344. I would affirm the trial court's order denying an award of prejudgment interest; I concur in the result in case no. 1991344.
JOHNSTONE, Justice (dissenting).
I respectfully dissent in both cases. I join Justice Houston and Justice Lyons in their analyses of case no. 1991216 (K.B. Weygand & Assocs. v. Deerwood Lake Land Co.). I dissent in case no. 1991344 (Deerwood Lake Land Co. v. K.B. Weygand & Assocs.), because an implied warranty is an implied contract contemplated by § 8-8-8, Ala.Code 1975; Deerwood's damages were the bills for the corrective work in sums stated and not seriously disputed; and the cardinal dispute between the parties was liability, not damages. The dispute about liability does not keep Deerwood's damages from being reasonably ascertainable as soon as Deerwood received the bills for the corrective work.
NOTES
[1] Only two Justices out of the seven Justices on the Court at that time concurred in the Broyles opinion; two Justices concurred in the result. Therefore, Broyles is not controlling.
[2] "The practice of medicine being to a great degree experimental, it cannot be said as a matter of common dealing and common sense, that a physician intended, in the absence of express words, to insure favorable results or a cure." 275 Ala. at 39, 151 So.2d at 771.
[3] Even lawyers, in trying cases before a jury, do not pretend to know what the status of a particular branch of science may be and whether it is too experimental or not. They hire experts for their clients to explain such matters to the judge and even then must present something more substantial than mere opinion. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (requiring the trial court to examine expert opinions to determine if the expert is qualified to testify as an expert in the field and if the expert testifies to reliable scientific evidence). Obviously, the trial judge would not use his own expertise to determine how advanced a particular profession is in scientific precision; neither should an appellate judge.
[4] The Broyles opinion stated:

"A contracting civil engineer ... should expect to be charged with a guaranty of reasonable results, and we think that in his dealings and in common fairness he does so expect. Resistance as here to accountability does not dissipate the fairness and justice of such an implication."
275 Ala. at 40, 151 So.2d at 772. Not only should the civil-engineering profession accept the result in Broyles with magnanimity, but apparently any "resistance," i.e., standing on the rules established by the laws of the State of Alabama long before the Broyles Justices issued their opinion, is an attempt to avoid "accountability." If only the attorneys were so accountable!
[5] With no authority but their own opinion, the two Justices joining Broyles stated:

"It is our opinion that an engineering survey of drainage requirements of a tract of land to be developed as a subdivision on which dwellings are to be erected, as here presented, is not entailed with unknown or uncontrollable topographical or landscape conditions as would prevent a drainage survey, if properly made with reasonable skill and diligence by a qualified civil engineer, from being reasonably accurate by the proper use of instruments and known formulas accepted and used by the civil engineering profession."
275 Ala. at 40, 151 So.2d at 772. How would a court know how to apply this thinking in the future? How would it know when a civil-engineering procedure is "not entailed with unknown or uncontrollable topographical or landscape conditions"? What is a reasonably accurate drainage survey? When does the engineer not properly use instruments and known formulas? These are questions only the civil-engineering profession itself is competent to answer. Yet, we can have judges making these decisions, apparently on their own understanding of these sciences, an understanding that may or may not be competent. Who will judge the judges in such a situation?