On Application for Rehearing

MALONE, Chief Justice.
The opinion issued on December 2, 2011, is withdrawn, and the following is substituted therefor.
GE Capital Aviation Services, Inc., now known as GE Capital Aviation Services, LLC (“GE Capital”), and Pemco World Air Services, Inc., and Alabama Aircraft Industries, Inc. (hereinafter collectively referred to as “Pemco”),[1] all national and international corporations in the aircraft industry, have fiercely litigated a commercial-contract dispute since 2004 in which each party alleged breach-of-contract and fraud claims against the other. GE Capital and Pemco each sought punitive damages in addition to compensatory damages. The litigation culminated in a jury trial that lasted approximately three weeks. The parties were ably represented by experienced counsel. The jury returned a verdict in favor of Pemco on all its claims, awarded Pemco $2,147,129 in compensatory damages and $6,500,000 in punitive damages, and returned a verdict in favor of Pemco on all of GE Capital’s counterclaims. GE Capital appeals from that aspect of the judgment entered on the jury verdict in favor of Pemco on its claims and from the trial court’s order denying GE Capital’s postjudgment motions. GE Capital does not appeal from that aspect of the judgment in favor of Pemco on GE Capital’s counterclaims. We reverse and remand.
I. Factual Background and Procedural History
GE Capital is an international leader in commercial-aircraft leasing and financing. Pemco operates an aircraft-maintenance and repair business used by several major national and international airlines and is authorized by the Federal Aviation Administration (“FAA”) to perform all types of aircraft. maintenance and repairs. This case deals with a commercial dispute between these corporate entities involving the administration of a detailed multi-mil-lion-dollar contract negotiated and drafted over a period of months and executed by principals of GE Capital and Pemco.
Maintenance inspections on commercial aircraft are governed by the manufacturer of the aircraft. The purpose of a routine maintenance inspection is to make the aircraft airworthy and safe until the next maintenance inspection required by the FAA. An inspection known in the aircraft industry as an “8C check” is one of the most comprehensive maintenance inspections an aircraft can undergo. The tasks necessary to perform an 8C check are dictated by a manual issued by the manufacturer of the aircraft, which contains what the industry refers to as “routine *752 task cards” specifying the inspection and maintenance tasks that must be completed. In addition to the routine tasks, both an 8C check and a check of the structure of the aircraft known as an “ISIP check” involve what the aircraft industry refers to as “nonroutine” maintenance for which there is no task card but which arises when an abnormal condition called a “discrepancy” is detected during an inspection. When a discrepancy is noted, a nonroutine card is generated, and FAA regulations require that any “discrepancy” that may impact safety or airworthiness must be repaired.
In the early 2000s, Pemco developed a proprietary process it uses to convert Boeing 737 passenger aircraft into cargo-freighter aircraft (a “P-to-F conversion”). Pemco obtained the FAA’s approval and authorization of its P-to-F conversion process and secured from the FAA a supplemental type certifícate (“STC”) allowing it to perform that conversion work. A P-to-F conversion requires gutting the interior of the aircraft and removing the seats, galley, lavatories, and overhead bins, cutting a hole in the side of the aircraft and installing a cargo door, installing a cargo-handling system, and adding structural embellishments such as strengthening the floor of the aircraft, among other tasks. Pemco spent approximately two years and $4-5 million to obtain its P-to-F conversion STC. By late 2002, Pemco had performed 35 P-to-F conversions on Boeing 737s.
During 2002, Frank Tucci, the president of Pemco’s Dothan operation, and Jim Lindberg, a senior vice president of GE Capital, negotiated a contract under which Pemco would perform maintenance and conversions on several Boeing 737s owned by GE Capital that GE Capital had leased to passenger airlines. When an airline’s lease of an aircraft expired, it generally leased newer aircraft and returned the older models to GE Capital. GE Capital planned to have the older aircraft modified so they could be leased to other companies as cargo freighters. At the time, Pemco operated the only facility in the world with an STC for P-to-F conversions on Boeing 737s. GE Capital was an attractive customer to Pemco because GE Capital owned a large fleet of 737s and Pemco hoped it would be able to secure repeat business with GE Capital.
During the contract negotiations, Lind-berg informed Tucci that GE Capital had contracted to lease two aircraft to TNT, a Belgian freight-delivery company, each with a specified date of delivery. For that reason, GE Capital wanted the conversion and maintenance work on those two aircraft performed simultaneously and completed as soon as possible. (Those two aircraft will hereinafter be referred to as “TNT-1” and “TNT-2,” or collectively as “the TNT aircraft.”) As to the TNT aircraft, GE Capital was interested in having Pemco perform 8C and ISIP checks, together with the P-to-F conversions. As to four other aircraft GE Capital planned to lease to Chinese companies (“the China aircraft”), it was interested in having Pem-co perform a different kind of conversion known as a “quick-change” or “QC” conversion. In a QC conversion, the aircraft is modified so it can be used either as a passenger aircraft or a cargo freighter, depending on the configuration of modular units the owner or lessee of the aircraft can install or remove depending on the owner’s or the lessee’s particular needs. In addition, GE Capital had an option to send four more aircraft to Pemco for work. The TNT aircraft are the subject of the dispute before this Court.
As the negotiations concluded, Pemco prepared its bid for the maintenance work and the P-to-F conversion to be performed on TNT-1. Pemco determined the *753 estimate for its maintenance bid by reviewing the requisite routine task cards from the manual for the aircraft, obtaining from the Pemco databases the overall hours it had expended in conducting 8C and ISIP maintenance checks for other companies, and calculating the ratio of nonroutine tasks to routine tasks associated with those inspections. Pemco also took into consideration the age of the aircraft and its history •with its previous operator but did not ask to inspect the aircraft or request any information generated by GE Capital. Pemco initially planned to bid the nonroutine work at a ratio of 1.5:1, estimating that it would spend 1.5 hours on nonroutine work for every hour of routine work, but it lowered that bid to a ratio of 1.3:1.[2] Pemco determined the estimate for its conversion bid by examining historical data and its previous P-to-F conversions on Boeing 737s. Pemco bid $2,587,440 to perform the work on TNT-1, which included a fixed price of $2,100,000 for the P-to-F conversion, $287,510 for routine and requested maintenance, and $199,930 for nonroutine maintenance not to exceed 25 hours per item.
Tucci and Lindberg, on behalf of Pemco and GE Capital, respectively, executed the Aircraft Modification Agreement (“the agreement”) on January 15, 2003, in which Pemco agreed to perform maintenance and P-to-F conversions on as many as 10 GE Capital aircraft. On the same day, Tucci signed an amendment to the agreement containing Pemco’s bid for the work to be done on TNT-1. That amendment was made a part of Exhibit A to the agreement.[3] The agreement also contained several provisions regarding additional maintenance GE Capital requested or that became necessary as the result of discrepancies revealed by Pemco’s inspection of TNT-1. The language in the agreement was drafted and/or approved by each party’s experienced and able counsel.
Section 1 of the agreement specified the work to be performed:
“A. Workscope. [Pemco] shall perform or cause to be performed the Modification as set forth in the attached Aircraft Statement of Work (Exhibit A). Exhibit A shall be amended by [Pemco] and [GE Capital] for each Aircraft to delineate such Aircraft’s specific comprehensive workscope and schedule. [Pemco] shall provide all labor, equipment, [Pemco] standard tooling and facilities necessary and required to accomplish the Modification. It shall also provide the Modification Materials as set forth in the Aircraft Statement of Work (Exhibit A) to accomplish such Modification.
“B. Regulatory Compliance. The Services and Modification performed under this agreement shall be performed in accordance with the standards of the airline industry and applicable FAA and JAA (to the extent not in conflict with the FAA)[4] regulations and in a good and workmanlike manner.”
*754 Section 5 of the agreement dealt with items requested by GE Capital:
“[GE Capital] may request, by written notification, additional Services concurrent with or in conjunction with the services and maintenance described in Exhibit A (‘[GE Capital’s] Requested Items’). Subject to availability of parts, materials, and labor, [Pemco] shall provide such additional services, and a written Additional Service Request describing the additional Services to be accomplished, and the associated schedule impact (if any), and the price to be paid shall be prepared, reviewed and signed by both [GE Capital] and [Pem-co], at which time such Additional Service Request shall become binding upon the parties and incorporated into this Agreement as an amendment thereto.”
' Section 6 of the agreement dealt with nonroutine items. It stated: “[Pemco] shall promptly notify the Designated Representative of the discovery of all Discrepancies which are Non-routine Items.”
The claims in Pemco’s complaint and GE Capital’s counterclaims principally revolve around (1) nonroutine items not included in any fixed-price items set forth in Exhibit A to the agreement and (2) additional services requested by GE Capital. Section 7 of the agreement provided for these items as follows:
“A. For Non-routine Items not included in any fixed price item set forth in Exhibit A, and for [GE Capital’s] Requested Items, [GE Capital] and [Pemco] shall either (1) negotiate in good faith a fixed price or (2) elect to accomplish such Items on a time and material basis in accordance with Exhibit B or as mutually agreed.
“B. [Pemco] will be under no obligation to proceed on any [GE Capital] Requested Item or Non-routine Item until agreement is reached. It is understood that any excessive delay in reaching such agreement may cause a delay in the redelivery date. [Pemco] shall not accomplish Services on the basis of a verbal request.
“C. For all Services being provided by [Pemco] to [GE Capital] on a time and material basis, [Pemco] shall provide each Work Day to the Designated Representative at his on-site office or internal mail box a daily print-out of all labor hours charged on each [GE Capital] Requested Item and each Non-Routine Item described above for the previous work day. This printout is to allow the Designated Representative to monitor and review the labor hours being charged. Labor hours shown on the daily print-out that are not questioned as being inaccurate or requiring information or clarification by the Designated Representative within five (5) Work Days after receipt of the daily print-out by the Designated Representative’s on-site office or internal mail box shall be deemed approved by [GE Capital] and [it] shall pay the recorded amount for such labor hours.”
Section 16 of the agreement provided for the on-site GE Capital employees who would represent GE Capital at the Pemco facility:
“A. [GE Capital] shall designate in writing to [Pemco], one or more Designated Representatives who shall carry out those functions described herein for [GE Capital], including authorizing additional [GE Capital] Requested Items and the repair of Non-routine Items, authorizing and signing the Additional Service Requests, accepting the Aircraft upon Redelivery, and carrying out the other functions described herein on behalf of [GE Capital], Each Designated Representative shall have full authority to act on behalf of [GE Capital] to carry out the functions described herein and *755 [Perneo] may rely on each Designated Representative for full authority to bind [GE Capital] with respect to any decisions to be made under this Agreement. A Designated Representative shall be available during the hours [Pemco] is performing Services on an Aircraft on any Work Day.
[[Image here]]
“C. [Pemco] will allow each Designated Representative access to work being performed pursuant to this Agreement. A Designated Representative shall not interfere with work in progress and will not give orders or directions to any employees, agents or workers of [Pemco], and will direct all communications directly to the [Pemco] program manager specifically assigned to this Agreement.”
GE Capital sent six planes to Pemco under the agreement — the TNT aircraft and the China aircraft. GE Capital assigned oversight of the work on the China aircraft to Hector Castellanos and Bret Lenius, who served as the designated representatives for the China aircraft. Their counterparts on the TNT aircraft were Kevin Foltz and James Ortiz, who served as the designated representatives for the TNT aircraft. Although the same Pemco personnel worked with both teams of designated representatives, the work proceeded smoothly on the China aircraft, and the parties were able to resolve all issues that arose. However, the work on the TNT aircraft did not proceed as well and gave rise to the legal disputes presented in this case.
TNT-1 arrived at Pemco’s Dothan facility on January 16, 2003. The tone for the working relationship between Ortiz and the Pemco employees was set at the first meeting between them. Various Pemco employees testified that Ortiz made the statement at the initial meeting that every company with which he had been involved on behalf of GE Capital had tried to “rip him off’ and that he expected Pemco would try to do the same. Ortiz testified that he did not make the statement and that the Pemco employees must have been mistaken. Predictably, disagreements between Ortiz and Pemco’s employees arose immediately. GE Capital alleges that Ortiz became, concerned about the quality of the workmanship of Pemco’s employees and that the work on TNT-1 quickly fell behind schedule. Pemco alleges that Ortiz was overly demanding and that working with him was frustrating and difficult. According to various Pemco employees, Ortiz cursed them, called them derogatory names, and made belittling comments. In addition, those same Pemco employees testified that Ortiz, contrary to Section 16.C. of the agreement, ordered them to redo completed work, directed them to do unnecessary work, and demanded that work be stopped for .days at a time. The Pemco employees testified that Ortiz went so far as to go behind their inspectors and mark areas where there were, in his opinion, discrepancies, thus generating many more nonroutine cards and many more hours of work than Pemco had estimated when it calculated its bids for the work on the TNT aircraft.
Pemco completed the maintenance and conversion on TNT-1 and delivered it to GE Capital on June 28, 2003, which was 56 days past the promised delivery date. Meanwhile, TNT-2 arrived at Pemco’s Do-than facility in April 2003. On June 3, 2003, Tucci signed an amendment to the agreement containing Pemco’s bid for the work on TNT-2. That amendment was made a part of Exhibit A to the agreement. Pemco based its bid for TNT-2 on its experience with TNT-1, taking into account all the difficulties it had experienced while working on TNT-1. Pemco adjusted its bid by raising the fixed price for routine maintenance, increasing the nonrou- *756 tine ratio from 1.3:1 to 1.8:1, modifying the scope of the work to expressly cover some of the extra work Ortiz insisted on for the P-to-F conversion, seeking unsuccessfully to have Ortiz removed from the TNT-2 project, and exercising its right to assert its statutory mechanic’s lien, thus refusing to allow TNT-2 to leave the Pemco facility until GE Capital had paid all outstanding invoices for work on the TNT-2 project. Pemco bid a fixed price of $3,181,629 for TNT-2, which included $2,100,000 for the P-to-F conversion, $509,537 for routine and requested maintenance, and $572,092 for nonroutine-maintenance hours under the 25-hour threshold per item. The parties experienced the same problems with TNT-2 as they did with TNT-1. Pemco completed the work on TNT-2 and delivered it to GE Capital on December 9, 2003, which was 101 days past the promised delivery date. Each party blames the other for the delays and increased costs associated with the work on the TNT aircraft.
Exhibit B to the agreement sets out the payment and pricing terms. Paragraph 2(a) of the payment terms, a part of Exhibit B, states: “[Pemco] will submit monthly invoices to [GE Capital] for completed [GE Capital] Requested Items and Non-Routine Items and for substantiated material and vendor services.” However, Pemco submitted its first invoice on TNT-1 on April 16, 2003. Thereafter, the parties disagreed about every invoice Pemco submitted. GE Capital initially complained that Pemco’s invoices included charges for unapproved work. Later in the project, GE Capital complained that Pemco’s invoices included labor costs regardless of whether the agreement permitted the charge, whether GE Capital had requested or approved the work, and whether the increased labor costs were caused by Pem-co error or inefficiency.
GE Capital maintained that the invoices for the P-to-F conversions included what Pemco called “over-and-above” and “out-of-sequence” charges and that the maintenance invoices included additional routine hours and unapproved nonroutine overruns. Pemco responded that GE Capital had caused delays or interference that justified additional charges under the agreement. Pemco complained that GE Capital sought to avoid its payment obligation in various ways, contended that a lack of supporting documentation was the basis for its nonpayment, and relied on extra-contractual requirements that were never part of the agreement for its nonpayment. The parties also dispute whether Ortiz received the daily reports of man-hours worked the previous day. Various Pemco employees testified at trial that Ortiz received the reports daily; Ortiz testified at trial that he hardly ever received them.
Another point of contention between the parties concerned whether Pemco was required to obtain Ortiz’s approval for all hours of labor worked on items beyond the 25-hour cap provided in the fixed price for maintenance. For each of the TNT aircraft, GE Capital sent Pemco a document of approximately 28-30 pages titled “Delivery Workscope” that describes the work necessary to prepare the aircraft for delivery to TNT. The document addressing the requirements for TNT-1 is dated December 13, 2002; the document addressing the requirements for TNT-2 is dated April 30, 2003. Both documents contain a page of numerous GE Capital “requirements.” Those requirements include:
“2. The on-site Technical Representative[5] assigned to this project will *757 approve all non-routine man-hour estimates prior to work starting. During hours that the Technical Representative is not on site please use the contact numbers that have been supplied.
“3. Any non-routine hours that exceed the ‘Technical Representative’s’ original approval must be re-approved for the additional man-hours by the ‘Technical Representative.’ Please note, this means prior to going over the estimated time. There will be no exceptions [as] this is in the best interest of both parties.
“4. Please inform all parties that each non-routine [item] must have documentation regarding parts replaced, worked [sic] performed to include any work in progress.... ”
Although GE Capital’s requirements were not included as exhibits to the agreement, it contends that those requirements control. Pemco contends that the agreement controls, specifically Section 7.C., which provides that any labor hours provided to the designated representative that the designated representative does not question ■within five work days “as being inaccurate or requiring information or clarification” are deemed approved.
The differences between Pemco’s initial bids on the TNT aircraft and its final invoices demonstrate how far apart the parties’ positions are in regard to invoicing. On January 15, 2003, Pemco submitted its bid on TNT-1 for $2,587,440. On June 11, 2003, Pemco submitted a redelivery invoice for TNT-1 to GE Capital for $4,919,964.75. Pemco required that GE Capital pay half of the redelivery invoice before it would deliver TNT-1. As to TNT-2, on June 3, 2003, Pemco submitted its bid for $3,181,629. Pemco submitted a final invoice for TNT-2 to GE Capital for $5,293,129.21 and refused to allow TNT-2 to leave its facility until GE Capital had paid all outstanding invoices on TNT-2. Even though GE Capital disputed many of the charges, it contends that it paid the remaining invoices under protest in order to meet its delivery obligation for TNT-2. A letter from a corporate representative for TNT to Pemco introduced at trial stated that TNT characterized the TNT aircraft delivered to it as having the “highest reliability” in its fleet.
In January 2004, GE Capital sued Pern-eo in New York, alleging that Pemco had breached the agreement and had fraudulently misrepresented or suppressed facts as to its ability to complete the work for which GE Capital had contracted and as to its billing practices. GE Capital sought both compensatory and punitive damages. Shortly thereafter, Pemco filed a complaint against GE Capital in the Dale Circuit Court alleging breach of contract. Paragraph 10 of Pemco’s complaint alleges:
“At the request of [GE Capital], Pem-co performed work on a number of aircraft pursuant to the terms and conditions of the Agreement. Pemco’s work has been accepted by [GE Capital], and [it] is obligated under the terms of the Agreement to make payment for the work completed. Pemco has submitted appropriate invoices to [GE Capital] for the amounts due under the Agreement, and the amounts are now past due.”
Pemco sought only compensatory damages.
GE Capital filed motions in Alabama and New York seeking to have the Alabama action dismissed, but both courts concluded that the litigation should proceed in Alabama. In October 2004, Pemco filed an amended complaint in the Alabama action alleging fraudulent suppression and misrepresentation in addition to breach of contract. Pemco contended that GE Capital had suppressed the predeliv-ery condition of the TNT aircraft, had demanded more than the industry-stan *758 dard quality of work required in the agreement, and had misrepresented that it would require only the industry standard or had suppressed its intention to require a higher standard. Pemco sought punitive damages as well as compensatory damages in its amended complaint. When GE Capital answered Pemco’s complaint, it also asserted counterclaims of breach of contract, negligent and wanton misconduct, fraud, fraudulent and/or negligent inducement to enter into the agreement, and conversion. In addition, GE Capital sought a judgment declaring that it owed nothing further to Pemco for the TNT aircraft. GE Capital’s counterclaims are identical to the claims alleged in its New York complaint, and, as it did in its New York complaint, GE Capital sought both compensatory and punitive damages.
Both parties actively pursued all their claims and engaged in extensive discovery. In September 2006, Pemco moved for a summary judgment as to GE Capital’s fraud counterclaims, arguing that GE Capital could not satisfy the element of reliance. GE Capital did not file a summary-judgment motion, but it opposed Pemco’s motion, arguing that all the parties’ claims involved factual disputes that should be submitted to a jury. Both parties contended in the trial court that it was possible for them to assert both breach-of-contract and fraud claims arising from the same facts.
The case proceeded to a jury trial beginning on March 30, 2009. GE Capital moved for a judgment as a matter of law (“JML”) as to Pemco’s claims at the close of Pemco’s evidence, and both parties moved for a JML at the close of GE Capital’s evidence and again at the close of all the evidence. Both parties argued that they were entitled to compensatory damages and punitive damages. Pemco argued for compensatory damages of $2,147,129 and punitive damages of two to three times the compensatory damages; GE Capital argued for compensatory damages of $1,991,225 and punitive damages of $1,900,000. The verdict forms, prepared by GE Capital and agreed to by Pemco, allowed the jury to return a verdict for either party. The verdict form for Pem-co’s claims required the jury to make a separate determination of liability as to each of Pemco’s claims — breach of contract, fraudulent suppression, and fraudulent misrepresentation. It permitted the jury to return a single compensatory-damages award for Pemco and to award punitive damages to Pemco if it found such damages appropriate. The verdict form for GE Capital’s counterclaims was similar, requiring the jury to make a separate determination of liability as to each of GE Capital’s counterclaims — alleging breach of contract, negligent and wanton misconduct, fraud, fraudulent and/or negligent inducement to enter into the agreement, conversion, and seeking a declaratory judgment. It permitted the jury to return a single compensatory-damages award for GE Capital and to award punitive damages to GE Capital if it concluded that such damages were appropriate.
The jury returned a verdict in favor of Pemco on its breach-of-contract, fraudulent-suppression, and fraudulent-misrepresentation claims, awarding compensatory damages of $2,147,129 and punitive damages of $6,500,000. The jury also returned a verdict in favor of Pemco on GE Capital’s counterclaims. The trial court entered a judgment on the verdict. GE Capital filed a postjudgment motion for a JML, a new trial, and/or a remittitur. The trial court denied the motion, and GE Capital appealed.
II. Standard of Review
A. Motion for a JML
“When reviewing a ruling on a motion for a JML, this Court uses the *759 same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).
B. Motion for a New Trial
“In discussing the standard of review in an appeal from a judgment based on a jury verdict where the trial court has denied a motion for a new trial, this Court has stated:
“ ‘ “Jury verdicts are presumed correct, and this presumption is strengthened by the trial court’s denial of a motion for a new trial. Therefore, a judgment based on a jury verdict will not be reversed unless it is ‘plainly and palpably' wrong.” ’
“Tanksley v. Alabama Gas Corp., 568 So.2d 731, 734 (Ala.1990) (quoting Davis v. Ulin, 545 So.2d 14, 15 (Ala.1989)).”
Petty-Fitzmaurice v. Steen, 871 So.2d 771, 773 (Ala.2003).
III. Analysis
A. Motion for a JML
We first address whether the trial court should have granted GE Capital’s motion for a JML as to Pemco’s fraud and breach-of-contract claims.[6]
1. Fraudulent Misrepresentation
In order to prove a claim of fraudulent misrepresentation, Perneo needed to establish “(1) that [GE Capital] made a false representation, (2) that the misrepresentation involved a material fact, (3) that [Perneo] relied on the misrepresentation, and (4) that the misrepresentation damaged [Perneo].” AmerUs Life Ins. Co. v. Smith, 5 So.3d 1200,1207 (Ala.2008). This Court has held that “for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation.” Hunt Petroleum Corp. v. State, 901 So.2d 1, 5 (Ala.2004).
The dispositive question as to this issue is whether Pemco proved the first element — that GE Capital made a false rep- *760 reservation. Pemco alleged in its amended complaint that
“[GE Capital] misrepresented that the inspection and maintenance services required of Pemco would be an ordinary ‘industry standard’ 8C and ISIP maintenance check, when in reality [GE Capital’s] intent was to require significantly more services, and the correction of significantly more discrepancies, than required under industry standards.”
The standard, however, was not misrepresented in the agreement. The agreement clearly provided that all work to be performed pursuant to it was to be “in accordance with the standards of the airline industry and applicable FAA ... regulations and in a good and workmanlike manner.” When Tucci, president of Pemco’s operations in Dothan who negotiated the agreement on behalf of Pemco, testified at trial, Pemco’s counsel asked him:
“Q. Did you have any discussions in your conversations with Mr. Lind-berg[, who represented GE Capital in the negotiations,] about what type of check you were going to have or what standards were going to be applied, if there’s anything unusual from just a regular industry standard?
“A. No. Jim [Lindberg] wanted to get the airplanes moving. I believe they were parked in the desert. I don’t want to get into [GE Capital’s] business. But normally when airplanes are parked in the desert, people aren’t paying lease fees. So Jim was in a hurry to get the airplanes leased to TNT. He wanted me to get the checks done. He wanted to get the conversions done. And he wanted to get the airplanes moving.”
Tucci testified that the term “basic industry check” referred to the 8C and ISIP checks provided for in the agreement. Ronald Aramini, president of Pemco’s operations in Birmingham, also testified at trial, but he did not testify as to any conversation he had had with a representative of GE Capital about the standard of work to be performed.
GE Capital contends that in using the term “standards of the airline industry” in the agreement, neither Lindberg nor Tucci was referring to a standard Pemco had to meet in performing the work; rather, it contends, the term referred to the scope of the work agreed upon. If GE Capital demanded something more from Pemco than work performed “in accordance with the standards of the airline industry,” GE Capital argues, it may have breached the agreement, but it did not make any misrepresentation.
Pemco argues that it presented sufficient evidence to support its fraudulent-misrepresentation claim, including evidence indicating that it was induced to execute the agreement because of GE Capital’s alleged fraudulent misrepresentation. As to pre-contract discussions about the need for the P-to-F conversion and the maintenance work to be performed quickly, Tucci testified in his direct examination in response to questions from Pem-co’s counsel:
“Q. Did you discuss with [Lindberg] what standards were going to be applied in doing the 8C and ISIP?
“A. He wanted a basic industry check, what the airlines would do to an airplane. He wanted the airplane made certified and airworthy and moved on to his new customer.
[[Image here]]
“Q. If the — In doing even an 8C-check, a heavy check, are you trying to go in and find everything that may be wrong in any fashion with the airplane?
*761 “A. No. You’re not building a new airplane. You’re complying with the requirements of the 8C-check.”
Before Pemco’s bid was submitted and the agreement executed, Tucci and Lind-berg discussed the scope of the maintenance work to be done because the non-routine-ratio calculation for Pemco’s bid would depend on that scope. GE Capital was aware, Pemco contends, that the ratio of routine items to nonroutine items was significant. Tucci testified at trial in response to questions from Pemco’s counsel that he expressed his concern about the scope of the work because of the provision in the agreement for simultaneous performance of the maintenance work and the P-to-F conversion, but he said Lindberg responded only that the work must be done simultaneously to meet the promised delivery dates of the TNT aircraft to TNT.
“Q. Just so I make sure we understand, to do a lot of the work, you initially take the landing gear off and shore it up with some sort of supports underneath the plane?
“A. The landing gear was removed as a requirement of the check.
“Q. Oh, as part of the 8C or ISIP check?
“A. Yes, sir. See, the two jobs have to flow together. It’s very difficult. I did not want to do the check with the conversion. It’s just so hard to coordinate all the work. But [GE Capital] had to have it done that way because they wanted the airplane done in a very quick time period so they could get the airplane to their lease customer. So Jim basically told me I had to do the two together, because he didn’t have the time to do the conversion and then go do the check. So we had to do them simultaneously.
“Q. Did you tell Mr. Lindberg that you would rather do them separately?
“A. Yes.
“Q. Okay. But he insisted that they be done together?
“A. Yes. He had to get the airplanes moving and on lease.”
Numerous witnesses for Pemco testified that Ortiz constantly demanded that Pern-eo perform work beyond that contemplated under normal 8C and ISIP checks. The scope of the work Pemco agreed to perform on the TNT aircraft was governed by the routine task cards applicable to the TNT aircraft, but, Pemco alleges, because Ortiz imposed his own standards, he increased the scope of the nonroutine work that was generated. Bill Wood, Pemco’s quality-control manager, testified about specific examples of Ortiz’s demands for more work than was required under the routine task cards, including instances where, even though inspections had been performed according to the cards, Ortiz ordered additional inspections. Other witnesses testified about Ortiz’s practice of marking additional discrepancies in the TNT aircraft that generated additional nonroutine repairs.
Pemco and GE Capital, two large national and international corporations, negotiated the agreement on equal footing. From our review of the record, it is clear that they can be viewed as equals in fact and in the eyes of the law. In addition, other corporate representatives and legal counsel for each corporation were involved preparing the agreement. The extensive negotiation and preparation culminated in Tucci’s and Lindberg’s executing the agreement on behalf of Pemco and GE Capital, respectively. The agreement is clear and unambiguous. It sets out the scope of the work to be performed by Pemco, the standard GE Capital expected for the work to be performed, a procedure for resolving service requests not spelled out in the agreement, and procedures for *762 payment for the work. If Ortiz went beyond the standard for which the parties contracted, then there may have been a breach of contract — an issue we do not here decide — but we see no evidence of a false representation. Consequently, we conclude that, as a matter of law, Pemco’s fraudulent-misrepresentation claim should not have been submitted to the jury.
2. Fraudulent Suppression
In order to prove a claim of fraudulent suppression, Pemco needed to establish “(1) that [GE Capital] had a duty to disclose an existing material fact; (2) that [GE Capital] suppressed that existing material fact; (3) that [GE Capital] had actual knowledge of the fact; (4) that [GE Capital’s] suppression of the fact induced [Pem-co] to act or to refrain from acting; and (5) that [Pemco] suffered actual damage as a proximate result.” State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 323-24 (Ala.1999).
The dispositive question as to this issue is whether Pemco proved the second element — that GE Capital suppressed a material existing fact. Pemco alleged in its amended complaint:
“At meetings prior to the execution of the Agreement, [GE Capital] representatives and agents confirmed to Pemco that the maintenance checks would be ‘standard’ checks, and that ‘standard’ inspections and cleaning were all that would be required.
“[GE Capital] knew before contracting with Pemco that the maintenance checks and inspections would not be standard, but rather would be significantly more detailed and rigorous than standard checks and inspections. [GE Capital] further knew that the expected checks and inspections would generate more ‘discrepancies,’ and that the maintenance work required of Pemco on the TNT aircraft would require a ratio of at least 4:1 or 5:1, Non-routine Items to Routine Items. [GE Capital] knew that the ratio would be significantly greater based upon it’s [sic] knowledge of the terrible condition of the aircraft prior to delivery and [GE Capital’s] knowledge that [GE Capital,] through its on-site agent and representative, James Ortiz (‘Ortiz’), would require more detailed inspections, and the correction of more ‘discrepancies,’ than that required by applicable airline industry and/or regulatory standards. [GE Capital] knew, therefore, that Pemco had substantially underbid the work.
[[Image here]]
“Neither the terrible pre-delivery condition of the aircraft or [GE Capital’s] knowledge that Ortiz would require more detailed inspections and the correction of more ‘discrepancies’ than that required by applicable airline industry and/or regulatory standards, were communicated to Pemco prior to the execution of the Agreement. Instead, [GE Capital] actively concealed those facts.”
Pemco’s fraudulent-suppression claim is based on its allegation that GE Capital suppressed two material facts: (1) the pre-delivery condition of the TNT aircraft and (2) the standard of work it would require. GE Capital maintains that Pemco did not present any evidence at trial indicating that the condition of the TNT aircraft or the standard of work was material to Pem-co’s decision to execute the agreement or that GE Capital suppressed either fact.
As to the predelivery condition of the TNT aircraft, GE Capital points out that Pemco apparently did not address the condition of the aircraft while negotiating the agreement. If the predelivery condition of the aircraft had been material, GE Capital alleges, Pemco could have negotiated provisions addressing it and/or sought to inspect the TNT aircraft before executing *763 the agreement or accepting delivery. Pemco knew that it was a standard practice in the aircraft industry to store aircraft currently not in use in the Mojave Desert because of the extremely low humidity, but it also knew that when aircraft are taken out of desert storage, they are extremely dirty. GE Capital employees testified that Pemco was notified by GE Capital employees that the TNT aircraft were “filthy.” Pemco employees testified that Pemco’s practice in negotiating contracts for maintenance and P-to-F conversions was to assume that an aircraft was in average condition based on the age of the aircraft and its prior operating history. Those employees further testified that such an assumption is necessary because it is difficult to accurately evaluate the condition of an aircraft before it is cleaned, towed into a hangar, and opened for inspection.
As to the standard of work to be performed by Pemco, GE Capital contends that the agreement clearly specifies the requisite standard and that it is only conjecture on Pemco’s part that GE Capital knew Ortiz would attempt to impose his own standards or that it suppressed from Pemco any deviation from the standard of work stated in the agreement.
As previously stated, the agreement formalized a multi-million-dollar transaction between two corporations on equal footing. The agreement clearly spells out the expectations and obligations of each party. Pemco’s claims as to the standard of work GE Capital expected from Pemco and what it knew about Ortiz’s work methods is mere speculation, not evidence. We see no evidence presented to the jury indicating that GE Capital suppressed from Pemco any material fact. Consequently, we conclude that, as a matter of law, Pemco’s fraudulent-suppression claim should not have been submitted to the jury.
3. Breach of an Express Contract
In order to establish that a breach of contract occurred, Pemco needed to prove: “ ‘(1) the existence of a valid contract binding the parties in the action, (2) [Pemco’s] own performance under the contract, (3) [GE Capital’s] nonperformance, and (4) damages.’ ” Employees’ Benefit Ass’n v. Grissett, 732 So.2d 968, 975 (Ala.1998) (quoting Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995) (citations omitted)). Accord, e.g., JP Morgan Chase v. J.H. Elec. of New York, Inc., 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2010).
As to the first element, it is undisputed that a valid contract existed. As to the second and third elements, Pemco produced evidence from which the jury could have concluded that Pemco proved its performance under the agreement, GE Capital’s nonperformance, and damage to Pem-co as a result of the breach. Therefore, the trial court properly submitted Pemco’s breach-of-contract claim, based on an alleged breach of the agreement, to the jury.
4. Breach of an Implied Contract
Pemco also argued to the jury that GE Capital was liable under a theory of implied contract. Pemco requested the following jury instructions on the theory of implied contract, which the trial court gave over GE Capital’s objections:
“The promises to perform need not have been made in express language. They may be implied from the conduct of the parties. It is not enough that Pemco hoped or expected that if it performed the services of the contract, [GE Capital] would pay for the services performed. To find such a promise, you must either find that [GE Capital], in express language, agreed that, if Pemco performed services under the contract, that [GE Capital] would pay for the *764 services performed, or that prior to performing, Pemco made it clear — or the actions of the parties made it clear that if Pemco performed the services, it expected [GE Capital] to pay for the services rendered, and that [GE Capital], thereafter, accepted performance or acted in such a way that demonstrated acceptance of the performance of the agreement. Substantial performance of a contract is performance of all its important parts, but does not require a full or exact performance of every slight or unimportant detail.
“A contract in fact arises from inferences that may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct. When services are rendered at the request of a recipient or under circumstances from which it can fairly be inferred that both parties expected the services would be compensated, there is a contract implied in fact to pay for them.”
GE Capital argues on appeal that Pem-co’s reliance on an implied-contract theory to override the express terms of the agreement is contrary to law. This Court has held:
“We first note that under Alabama law, claims of both an express and an implied contract on the same subject matter are generally incompatible. This Court has recognized that where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter. Vardaman v. Florence City Bd. of Educ., 544 So.2d 962 (Ala.1989); Hendrix, Mohr & Yardley, Inc. v. City of Daphne, 359 So.2d 792 (Ala.1978); Robinson Lumber Co. v. Sager, 199 Ala. 675, 75 So. 309 (1917).”
Kennedy v. Polar-BEK & Baker Wildwood P’ship, 682 So.2d 443, 447 (Ala.1996). Accord, e.g., Katz v. American Mayflower Life Ins. Co. of New York, 14 A.D.3d 195, 202, 788 N.Y.S.2d 15, 20 (2004).
Pemco argues that even though the agreement provided a sound basis for the jury verdict in its favor, the evidence also revealed that the parties entered into agreements that were independent of the agreement. In light of “this evidence,” Pemco argues, the trial court did not exceed its discretion in instructing the jury on the theory of implied contract. The evidence to which Pemco refers, however, is evidence of express oral contracts, not implied contracts. Pemco contends that the instructions it requested were proper and that the jury, consistent with those instructions, correctly returned a verdict in its favor for breach of an implied contract.
In reviewing the record in this case, this Court cannot find any evidence that would support an implied-contract theory. Moreover, the existence of the agreement makes recovery on a theory of implied contract improper; therefore, we conclude that the trial court erred in giving the jury Pemco’s requested charge regarding an implied contract and in submitting that claim to the jury.
5. Disposition of GE Capital’s Motion for a JML
We conclude that Pemco failed to offer substantial evidence showing that GE Capital made a false representation, that it suppressed any material existing fact, or that would support a breach-of-an-implied-contract theory. Because, as a matter of law, the evidence does not support a finding of fraudulent misrepresentation, fraudulent suppression, or the breach of an implied contract, the trial court erred in denying GE Capital’s motion for a JML on both of Pemco’s fraud claims and its breach-of-an-implied-contract claim. Therefore, those claims should not have *765 been submitted to the jury, and that portion of the trial court’s order denying GE Capital’s motion for a JML as to Pemco’s fraud and breach-of-an-implied-contract claims is due to be reversed.
As to Pemco’s breach-of-an-express-contract claim, however, we conclude that Pemco offered substantial evidence that GE Capital breached the agreement; therefore, the trial court did not err in denying GE Capital’s motion for a JML as to Pemco’s breach-of-an-express-contract claim, and that claim was properly submitted to the jury.
B. Motion for a New Trial
We next address whether the trial court should have granted GE Capital’s motion for a new trial as to Pemco’s breach-of-contract claim.
The jury returned a verdict in this case finding for Pemco on all of Pemco’s claims against GE Capital. Because the breach-of-an-implied-contract claim was improperly submitted to the jury, we have in this appeal — as to the verdict on the breach-of-contract claim — a “good count-bad count” situation analogous to that in Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981). Waddell & Reed, 875 So.2d at 1165-66. See also Life Ins. Co. of Georgia v. Smith, 719 So.2d 797 (Ala.1998). We cannot assume that the verdict finding GE Capital liable was based only on Pemco’s breach-of-contract claim that was properly submitted to the jury. Accordingly, the judgment based on the jury verdict for Pemco on Pemco’s breach-of-contract claim must be reversed; we remand this case for a new trial on Pemco’s breach-of-an-express-contract claim.[7]
IV. Conclusion
We reverse the trial court’s order denying GE Capital’s motion for a JML as to Pemco’s fraud claims and its breach-of-an-implied-contract claim. We also reverse the trial court’s order denying GE Capital’s motion for a new trial. We remand the cause and direct the trial court to enter a JML in favor of GE Capital as to Pemco’s fraudulent-misrepresentation claim, its fraudulent-suppression claim, and its implied-contract claim and to enter an order granting GE Capital’s motion for a new trial as to Pemco’s breach-of-contract claim alleging a breach of the agreement. Because we conclude that the trial court should have granted a JML as to Pemco’s fraud and implied-contract claims and a new trial as to Pemco’s breach-of-contract claim, we pretermit consideration of the other arguments made by the parties.
APPLICATION OVERRULED; OPINION OF DECEMBER 2, 2011, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED WITH DIRECTIONS.
WOODALL, STUART, BOLIN, PARKER, SHAW, and WISE, JJ., concur.
MURDOCK, J., concurs in the result.

. Pemco World Air Services, Inc., filed the original complaint. At some point after this action was commenced, the Birmingham operation of Pemco was incorporated as Alabama Aircraft Industries, Inc. The Dothan operation of Pemco retained the name Pemco World Air Services, Inc. Because it is unclear when the incorporation of Alabama Aircraft occurred, we have treated the two companies as one entity. The two companies have filed a joint brief before this Court.

.GE Capital alleges that Pemco's management decided to lower the ratio to 1.3:1 to generate a more competitive bid. Pemco alleges that after discussions between Ronald Aramini, the president of Pemco's Birmingham operation, and Christopher Damianos, GE Capital’s senior vice president and manager, Pemco lowered the ratio to 1.3:1 at Damianos's request. A resolution of these factual allegations, however, is not necessary to our decision in this matter; therefore, we need not address this issue.

. A subsequent amendment regarding TNT-2 was also made a part of Exhibit A. That amendment is discussed later in this opinion.

. The JAA is the European equivalent of the FAA.

. The parties do not tell us whether the person described in the agreement as the "Designated Representative” is the same as the person described in the GE Capital requirements as the “Technical Representative,” although that appears to be the case.

. Although the agreement contains a provision stating that it is to be construed in accordance with New York law, the parties' tort claims are governed by Alabama law. Lifestor Response of Alabama, Inc. v. Admiral Ins. Co., 17 So.3d 200, 213 (Ala.2009); Fitts v. Minnesota Mining & Mfg. Co., 581 So.2d 819, 823 (Ala.1991).

. Pemco argues on application for rehearing that, because GE Capital drafted the verdict forms, the verdict should stand on the basis of the doctrine of invited error, under which the verdict may be presumed to rest on the "good count." This Court has so held on other occasions. Here, however, GE Capital did not "invite” the error as to the implied-contract jury instructions, and it properly preserved that error for appellate review.